Good morning, sir. How are you doing? Hang on just a minute. Let everybody get settled. I'm sorry? I just said hang on a minute. Let everybody kind of get settled. Yes. All right, sir. We're ready when you are. Thank you. May it please the court. I'd like to talk about basically three points of the contract that are, I think, very key. The first one would be direct and sole clause, the accidental, the meaning of accidental, and then the interplay of the exclusion versus the exceptions. And I'll start with the language of the contract. It says if you or a dependent sustained an accidental injury, number one, that is the direct and sole clause, number two, of a covered loss, number three, described in the schedule of benefits, proof of the accidental injury and the covered loss must be sent to us. Now, the key terms there are three of them, accidental injury, sole and direct clause, and covered loss. Those are three very important terms. Now, the covered loss is a schedule. It's a list of things that the insurance will cover. It's not every injury. It's some of them, and it's the covered loss. Covered losses include loss of lives, loss of hand, loss of sight, so on and so forth. Now, the direct and sole clause is defined right below, and it says it means that the covered losses occur within 12 months of the accidental injury. The accidental injury, of course, is a heart, some sort of damage. In our case, it's the anoxic brain injury. In our case, the anoxic brain injury happened about two days before the covered loss, which is the death. Medlife interpretation is not what the contract says. Medlife has moved direct and sole between the accident and injury. It's a huge difference, right? Now, I know Medlife has done that because they keep on talking about this as the injury. Medlife says determine that the claim accidental injury, Mr. Wick's unintentional narcotic overdose was not the direct sole cause of the death. So they have put direct sole cause in between accident and injury, and that's a huge problem because what they do by doing that is that any eggshell claimant, any condition that the claimant has, they use it to defeat the direct and sole cause and say, hey, you know, the injury didn't just— Okay, give us your— Interpretation? Give us your articulation of how the provision should be read. How the contract should be written? Yes. I mean, in order for you to prevail, I'm saying just tell us. I mean, you've argued and you've briefed and you're telling us what— Right, exactly. And so very simply, now, it makes perfect sense that not injuries are covered. Some injuries lead to covered losses, some don't. Now, the injury in our case is an anoxic brain injury, and it states here in the death certificate is the immediate cause of the death. Yeah. Okay. Yes, sir. Well, I agree. The death certificate says the anoxic brain injury is the immediate cause. So to me, you've satisfied the direct cause, but give me in this administrative record any evidence that shows it was the sole, that is, the one and only, the single cause. Right. Because the death certificate says a contributory cause, maybe not the dominant one, was the fact that he had this disease of obesity. Right. And that's where the injury word comes in, because the direct and sole cause only is triggered if it's an injury. Well, instead, don't say direct and sole. Just give me the best evidence in the record from your experts, anyone, that the sole cause here was the pain medication. Right. What's your best evidence that there was no other contributing cause? In other words, had he, the deceased, been electrocuted, I would think, okay, sole cause. But here, the death certificate itself says a contributing cause was the disease. Right. Right? But then you're in trouble. If there's no evidence that it was solely caused by this accident, instead there was a contributing cause, I would think you don't have coverage. That's what the district court said, right? Well, and I'll get to the definition of accident here in a second. So there's a difference between a risk factor and a causative factor. Okay, I'm going to ask one last time. What's your best evidence in this administrative record that the sole cause was the injury that you're pointing to? Between the death and the anoxic brain injury, those two days, nothing happened to my client. There was no other event that led him to the death. Now, he was obese before, and he would have been obese the day after. Let me ask it differently. Dr. Zhang, is that how you pronounce his name? Zhang.  And then Dr. Durack, and we have the autopsy report, we have this death certificate. Did any of them say the death came about solely due to the administration of these drugs? Yes or no? Did any of them say that the death came about solely because of the dosage given to him? Yes or no? Yes. Okay. Who and which one? Just point me to that fact. All right. They did it because they excluded any other possibility. Okay, that's what I'm asking for. Point me in the record to where your expert or these documentaries say, we have excluded all other contributing causes. The autopsy report found that it was an anoxic brain injury, and they found nothing else. They didn't find an infraction. They didn't find a heart attack. They didn't find any other event that caused the death. Even their doctor said, hey, it was the medication. Now, he was there because he was obese, so it was a medication. Nothing on the record indicates any alternative cause, and that's why. . . No, but they all do use the qualifier immediate. They say the immediate, and if I'm not mistaken, Dr. Durack explicitly says he can't conclude death came about solely because of the drugs. Right. That's true. So he doesn't have an opinion. He what? He doesn't have an opinion, so I don't see why that would even be considered. He cannot conclude what caused it. I think it's your burden to show some positive evidence. Right, and I think the birth certificate tells us. But isn't that inconsistent with at least the logic described in Thomas? I know that you don't think it's. . .  Yeah, and let me get to Thomas. So Thomas, that's the first one. That's direct sole cause. Now, Thomas goes into obesity-treatment-related deaths, right? Stem from pre-existing infirmity or obesity rather than from an accident. I understand that, provided that there's proper medical treatment. Now, first of all, now when I think the rules should be broader to include other infirmities that are on their way to cause a covered loss, right? So if you show up with diabetes and you're going to lose a leg or a foot and you lose it because of the diabetes, you can't blame the doctors for not doing their job and trying to save you, and it wasn't an accident. I understand that, right? And that can be for old age, osteoporosis, anything, any condition that makes you more susceptible to a covered loss. It's not causative because you're more susceptible, just like an actual plaintiff. Okay, well, let's say leukemia. Exactly. And you're getting chemo. And you're getting chemo. And the chemo's just . . . It just . . . Don't work. Causes your heart to go. Absolutely. And then you die. The sole cause of the death there is the chemo? No, no, no. The sole cause, it may not be, but the failure of the medical treatment would not save you from the fact that leukemia was going to kill you anyhow. So if you have a disease or an infirmity that is taking you to a covered loss, whatever that may be, and the medical treatment fails . . . Well, no, I'm not saying the medical treatment fails. I'm just saying you're getting chemo, and as happens with leukemia patients, sometimes the chemo's just too strong and your heart dies. Right, exactly. But how is that not exactly like this situation? Well, the difference is because there's no clause in the contract that says, we will not cover that unless it's chemotherapy. No, but it says it's got to be the sole cause. And Thomas says when you say that, you've got to rule out the others. Yes, but the sole cause, even if that were to be the case. Let's say that it's not the injury and it's just got to be the sole cause. The sole cause is not the only clause in the contract.  You've got to read it in its entirety. You're saying exclusion, the eighth exclusion about the physician-prescribed drugs. Right, exactly. You can't infer coverage from an exclusion, can you? Certainly. Yes, certainly? Yes, of course. Well, okay. Well, certainly according to this contract. Okay. Keep going. Right, so for example, there's other exclusions. It says, hey, you know, you can't, we will not cover anything if you jump off an airplane. It's literally here, right? However, except for self-preservation. So if the airplane is on fire and you jump off, that's not an accident. You're meant to jump off. Objectively, you know you're going to get hurt. Anybody would think it's hurt. So it's not an accident by any definition. But it's specifically covered. So it would count. And it's not the only one. We have another one that says we will not cover infection unless it says other than infection occurring from an external wound. Well, okay, so the wound didn't cause you to lose your hand. But instead of hypotheticals, and I've asked some, so I'm not criticizing you, just point to the exclusionary language that you're saying supports the fact that your client, your... On this one, it says we will not cover the voluntary intake or use of any means of any drug, medication, or sedative unless it is taken or used as prescribed. So on that situation, necessarily it needs to do more than one cause. Necessarily, because a physician's not going to give you a drug just because, right? You've got to have some sort of ailment. The district court never got to the exclusions, right? The district court stopped with direct and sole. Yeah, it stopped at accidental, right? It stopped at accidental. So say we have an injury. It was a direct sole cause of the death. But it wasn't accidental. And it wasn't accidental because of the two cases or several cases that this court has decided. One was a migraine and such, I think, and the other one was a sepsis. But the difference between those two situations and this one is that this one specifically says this particular medical, proper medical treatment is covered. We will consider it an accident, right? And therefore, we should get coverage. Now, had the contract in Thomas had, hey, we're not going to cover those except if you die of sepsis, well, then sepsis would have covered. Or if it had, hey, unless it's a migraine and such, well, then it would be covered, you know? And, again, the fact that this rule exists puts obese people at a disadvantage, right, when they sign up for a contract because their obesity can almost always be construed as a contributing factor, right? And, again, other risk factors as well, osteoporosis, you know, Alzheimer's, you know, if an old person were to fall and break their leg and they can't repair it because of the osteoporosis and it gets amputated, their record will show a contributing factor is, you know, your age. Again, that is putting direct and sole cause between accident and injury, and that's not what this contract says. What this contract says, give me the injury first. What is the injury? My instinct is to see it differently, that obesity is no different than, again, cancer, but cancer requires stiff measures, strong chemo, here, strong pain med, and sometimes the disease plus the treatment ends up in death. And I get that. But then it's hard for me to say that the death is solely caused by the treatment. But you're still grabbing that sole cause and putting it on top of the remainder of the contract. It's not the only cause. Okay, so that is your argument, is looking at the contract as a whole. Well, direct sole cause, number one, is not being used properly. It shouldn't be used at all because this one requires more than a single cause. And if it is to be used, then it should be used in a spectrum of how proximate is the disease to the death, right? So if an obese person is . . . You aren't contending, and the record doesn't contend, that they administered the wrong drug. No. So it was a proper dosage, yes. It was a proper dosage. It was a proper medical treatment. Now, I do not understand why the court would ever think that proper medical treatment doesn't kill. Now, obviously, it's a practice, and even proper medical treatment can kill. And proper medical treatment changes through the ages. Getting syringe back in the atis could have killed you. And not too long ago, not having the protocol with masks would have killed you because who would have known about it? I mean, the basic life insurance was given here. The question is, was there also an additional accident? And it seems somewhat intuitive to say an accident contemplates something that's mistaken. Right. Accident is not defined. An accident according to, you know, any dictionary is, you know, happening, existing by chance. You know, the Cambridge, the Oxford language says accident is happening by chance unintentionally. Now, this is key because here in the record we have unintentional. Well, obviously, they didn't mean to kill him, right? Otherwise, that would be murder. So that's accidental. The result was by chance because he had an objective. But it wasn't even an accidental overdose. It was the right dose. Accident does not mean that they didn't. In this, you know, per the definition, it's just not getting the desired result. And this court has defined it as having an objective, you know, expectation of survival and a subjective. If soul isn't defined in the contract, would you accept that it means one and only? Soul, it means one and only, yes. Yes, I think that's true, yeah. That would be. Now, again, the contract could say the accident has to be the soul and direct cause of the covered loss. That's not what it says. It could say that. But it doesn't say that. It has to be the injury to be the direct and sole cause. And so we think that this one, you know, it works. All right, sir, we have you open an argument. You've reserved rebuttal time. Yes. We'll hear from Ms. Moore. May it please the court, my name is Linda Moore and I represent Metropolitan Life Insurance Company in this case. As the court has indicated by this appeal, Ms. Wicks is attempting to create coverage under the benefit plan through an exception to an exclusion. This she cannot do. This court has stated in an unpublished decision in Martin Resource Management Corp. that attempting to invoke an exclusion to create coverage when coverage does not exist is an improper bypass of the required step of a party's burden to establish coverage. And Mrs. Wicks had that burden, but she failed to meet it in this case. The district court's decision should be upheld for two reasons. One, the evidence in the administrative record established as a matter of law that there was no accidental injury as required for coverage. And even if there was an accidental injury, it was not the direct and sole cause of Mr. Wicks' death independent of other causes. But the contract doesn't say independent of. And the autopsy does create a fact issue as to it being the direct cause because the autopsy itself says it was the immediate cause. So am I right to think this case on that point really reduces to whether it was the sole cause as opposed to it certainly seems to me it was the direct cause, or at least there's facts to that. The direct and sole cause is defined in the plan as a direct result of the accidental injury, independent of other causes. So the independence is what ties to sole? Is that the way to think? Okay. Yes, Your Honor. Well, I guess then testing that, let's imagine same facts, obesity, successful gastric sleeve surgery. Mr. Wicks goes back home and starts a PT program, but then he falls on the treadmill and dies as a result of that. Would MetLife be here saying, well, that wasn't solely caused by the trip and fall on the treadmill because the contributing factor is the obesity? Well, if certainly that's whatever the facts reveal or bear out, if that is a contributing cause. No, I'm just trying to imagine pursuant to treatment, proper treatment, accidental death, is MetLife interpreting this contract to mean no matter how attenuated, because he was obese, no accidental contributing immediate factor can ever be covered? Well, in this case, obviously the death certificate says that obesity and severe obstructive sleep apnea is contributing, are contributing causes. There, in your scenario, it would depend what the result, or rather what the evidence showed were contributing causes, I believe. I think it's a fact-intensive issue there with regard to your scenario. Because a lot of treatment is post-op. You're out of the hospital, but you're following treatment for the underlying disease, and I'm trying to tease out whether you interpret this language to mean all those are not covered. I would say that under your scenario it is not covered. Obviously, covered loss can occur within 12 months, but I believe in this case under your scenario. What about my electrocution example? In other words, he's still in the hospital, he's being treated, but a wire has been left there. In that situation, I would think the electrocution killed him. Independently, solely. Exactly, exactly. So it turns on the propriety of the treatment. Yes, Your Honor, it could, absolutely. And in this case, there's not an accidental injury, as the court has found in Thomas, because in that case the court stated that Mr. Thomas suffered from morbid obesity. There he had two stapling surgeries, and the staples came loose. He died of sepsis. The issue was whether a death resulting from complications following stomach stapling surgery was an accident, as defined under the ERISA-governed plan. This court determined that it was not an accidental death, and that is the same situation here. In making that determination, the court relied on the Seventh Circuit's analysis in Sinker v. Hartford. And in that case, a patient was being treated for Crohn's disease and was in surgery, and a migrating catheter punctured her heart and killed her. The Seventh Circuit concluded there was no coverage because the death resulted from her illness and not an accident, as defined under the plan, because it occurred from standard complications of standard medical treatment. Here, the fact is that there was no accidental injury is even stronger and clearer, because in those cases there was something that did go awry. Here, Mr. Wicks simply aspirated shortly after being given the dilutant, and when he was found, he was unconscious. Emergency procedures to save him were started, but they were unsuccessful, and two days later he passed away. So, number one, there is no accidental injury here. Second, the district court determined that the plaintiff's claimed accident was not the direct and sole cause. In making that determination, the court determined that Mr. Wicks died, again, from standard complications of standard medical treatment. Mr. Wicks received proper medical treatment, and relying on a prior decision that he determined based on this very insuring provision, he pointed out that there was not one piece of evidence in the record that the accidental overdose was the sole and direct cause of Mr. Wicks' death. Opposing counsel, you heard said, but there's also no evidence in the record that excludes that conclusion. Well, he has the burden of proving that this was not, that the administration of the dilutant was the sole cause, and he has not proved that. It's clear that Mr. Wicks had a history of morbid obesity and severe obstructive sleep apnea. Even in the medical records where there are indications of his respiratory failure, it talks about he also had severe sleep apnea. Also, importantly, the primary document, the death certificate, says that the illnesses of infirmity and morbid obesity, the illnesses or infirmities of morbid obesity and severe obstructive sleep apnea were significant causes of his death. So he died, he aspirated. Was the sleep apnea breathing issues contributory? The death certificate certainly says it. Now, in any of the experts' reports, they don't address that. But as I said, in the actual medical records, during this two-day period, when it is noted his respiratory failure, it notes that he does have severe sleep apnea. Well, just a curiosity question. You know, if he's there, and, I mean, ordinarily, if someone has sleep apnea or whatever, you know, they either have inspire or wear the mask, et cetera, et cetera, which ameliorates the situation. So I'm just sort of curious, since they keep mentioning it, whether or not those typical ameliorative devices, either CPAP or something else, was in place so that the typical risk of sleep apnea were at play in combination with the other. Do you follow what I'm saying? And, I mean, nothing says it, but I just, when you read it, it keeps saying, well, yeah, you had it, but. And it was noted on the death certificate as contributing to his death. All right. Since he died, that's not germane to the outcome, but it is continually mentioned in the course of it, particularly since he died. You know, he aspirated, which obviously relates to the breathing, and if it's saying that he had a normal dose of the Dilaudid, that that wasn't it. So anyway, still, your argument is none of this was an accident. It's a, the trial court found it was a natural flow. It was a consequence of the surgery that he had, basically. His obesity, yes. Okay. In some insurance policy cases, this court has considered Gray v. Minnesota Life and Seckill v. Aetna Life Insurance Company. The court has stated that where policies provide that an accident must directly and independently be the cause of the loss, which we have here, the general rule is that if disease is a concurrent cause, coverage does not exist, and the insurance company is not liable. She received the top end of the policy. She's trying to recover from the accidental portions of the policy, right? That's correct. She received the basic life. And there were two accidental death coverages under this policy, the basic and the voluntary. Okay. In conclusion, proper coverage analysis begins by considering whether the insuring provision creates coverage for the disputed claim. If coverage exists, then and only then does the court consider whether any exclusions apply. If coverage does not exist, the inquiry ends, which is the case here. Exclusions are no longer part of the analysis because they cannot expand the basic coverage granted in the insuring agreement. I think his argument on that is it's not expanding, but we do look at the contract as a whole to make sense of it. So do you have, can you speak to Exclusion 8, which is the exception from Exclusion 1? Yes, Your Honor. Certainly the general rule of interpretation is that you look at a contract as a whole, but in ensuring How do you harmonize the exception to the no medical treatment? I think, unlike the Fourth Circuit case, the Clark case that I believe he cited, I believe you don't look at those in conjunction. You look at them separately because the illness exclusion pertains to illness. Prescriptions by a doctor can be given for a number of things other than illness. For example, you break your arm, you get a pain medication, birth control pills. So I think they can be read separately. And so as MetLife said in its denial letter, if... But Exclusion 1 is not just illness, it's or the diagnosis or treatment. It's illness and treatment. Correct. So the birth control and the other examples you get, those are still treatments, even if they don't... But not for illnesses. Oh, it's treatment of such illness. Right, illness or diseases. So I think they can be read separately. Thank you, counsel. So we're asking that the court uphold the district court's decision. Thank you, Your Honor. All right. Thank you, ma'am. All right. Back to the Federal of Garza. Any rebuttal you may have. Thank you. I think I just heard, don't look at the contract. I think we have to look at the contract. And we have to look at the contract as how a person would have looked at this contract when they sign up a contract. Now, if you sign up a contract that says, hey, I'm signing up for accidental death, immediately one knows that accidents happen anywhere, anytime, in hospitals. They know that doctors mess up and they cause accidents. There's no automatic exclusion in the head of a layman person when this happens. You're not saying there was a mess up here. No, I'm not saying. You just said accidents happen, doctors mess up. But this isn't a doctor mess up case. Yes. But what I'm saying is she says that, hey, from the get-go this is not an accident because it's in a hospital. Well, not from a layman point of term. No, but she conceded the electrocution example, that's an accident. Right, but a doctor. She's saying here there was never any accident. Well, yeah, no, the accident, right, according to the definition of accident. And I didn't make, this is the definition. What is the accident you're saying? What is the accident? I mean, he got the correct amount of Dilaudid. So is there an accident here that's the sole cause that you rely on? We can say that he was correct as far as the protocol. No, no, no, no, just answer my question. We already heard you about the policy provisions. We got that. You're up on rebuttal. So I'm just saying tell us what you say the accident was in this case. You're attempting to get in through an explosion here to say it was an accident. Just tell me what's the accident. The accident is that he died from an operation that he thought he was going to survive and he had an expectation to survive. But why is that an accident? Because according to the definition of accidents, that's what they are. I didn't make the definition of accidents. I'm getting this from the dictionary. When you have an expectation to survive. If you don't allow for the possibility, the dictionary will not get you to home plate. Right. It won't get you there. Okay, let's take it another way. What's in the administrative record? What's in the record that the district court was looking at that would support the panel determining that there was an accident within the meaning of the policy that is at play in this case? The policy does not describe. There's no meaning in the policy of accidents. Listen closely to my question. Don't go to what I'm not asking you, okay? I'm asking you what is in the administrative record that would support a determination of an accident that would support the argument that you are making? Don't tell me what's in the policy. I say what's in the record. Unintentional narcotic overdose. That is the precipitating event. Unintentional narcotic overdose. It's right there. They unintentionally gave him too much drugs. Now, that's what I differentiate between a protocol because it seems like the court is bent on finding the doctor's doing something wrong, that you can do everything right and still be an accident. According to the definition of accident. What's your best case that supports that proposition? I mean, in order for you to prevail here. Right. I don't. I mean, there are cases in my brief that have found that, yes, of course, if you get too much drugs. What's your best case? Best case. You're up on rebuttal and, you know, you're trying to round third base, but you've got to have a case that helps get you there. What's the best one that would say, we know what this says in the abstract accident. I'm not trying to trick you. I'm just saying, what's the best case? We have Thomas, which is a morbid obesity case, and says what it does. I know you want to distinguish it, but I'm just saying, what's the best case that would get you within this administrative record to say there's an accident that's a sole cause that would get you within the policy language? Right. So I am going to the contract, and I'm going to the facts, apply them to this contract. I came to this case strange to it, and I read the contract, and I saw the facts, and it lines up to me, and it makes sense. They messed up because they gave him a drug that overpowered him, and they shouldn't have. They messed up because of what? They messed up because they gave him a drug that overpowered him. They shouldn't have given him the drug altogether. He could have been in pain and survived, but they gave him an opiate, and fentanyl is killing people everywhere. So any policy that purports to – What support in the administrative record is your times running out for overdose? I thought on the principal argument you agreed it was a correct dose. I know you're pointing to that, but on principal argument you said, oh, it was actually a correct dose. So we're talking about two different things. Okay. All right? Yeah. It was an overdose for this individual. It was not overdose according to the protocols of the hospital. The protocol says given so much. But you don't have an expert. The expert in here did no punishment. Well, then in that case, then they did do an overdose because that's what the death certificate says. It says overdose right here. Then it was an overdose. All right, Mr. Lagarza, we got you argued. You argued passionately. Thank you. On behalf of your client. That's what good lawyers do. You go with what you have, and you do keep digging. So we appreciate it. Interesting case. That's why we set it for him. So thank you for your argument. Thank you, Ms. Moore. We appreciate it. The argument along with the brief, the case will be submitted. Thank you. Thank you, sir. All righty.